IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GIQUITA HUGHES,

    Plaintiff,

vs.                                CASE NO. CV-02-J-2301-S

BOTTEGA, INC.,

    Defendant.

## MEMORANDUM OPINION

Pending before the court is the defendant's motion for summary judgment (doc. 31), evidence in support of said motion and a memorandum of law. The plaintiff submitted a response thereto and filed evidence in support of her opposition (doc. 33), to which the defendant has submitted a reply. The defendant also submitted a request for oral argument. The court finding oral argument will not be of substantial assistance, said request is **DENIED**.

Plaintiff commenced this action by filing a complaint alleging the defendant discriminated and retaliated against her, on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"). Upon consideration of the pleadings, memoranda of the parties and evidentiary submissions received, the court concludes that the motion for summary judgment is

due to be granted as no genuine issues of material fact remain and the defendant is entitled to judgment in its favor as a matter of law.

## FACTUAL BACKGROUND

Defendant is a restaurant. Plaintiff began working for defendant as a server in April, 1997.[1] Plaintiff depo. at 73-74, 158; Stitt depo. at 13.[2] She was interviewed by Dean Robb, Dena Booth and Keith Richards, then hired by either Robb or Richards. Plaintiff depo. at 156-157; Stitt depo. at 19-20. Robb was the general manager of the defendant restaurant during plaintiff's entire employment and Richards' supervisor at the time she was hired. Plaintiff depo. at 157. Plaintiff also worked as a café manager for defendant from November, 1998 until July, 1999, when she decided she wanted to return to her position as a server. *Id.* at 159-160, 168. Robb was responsible for promoting the plaintiff to a manager position. Stitt depo. at 15.

In 2001, the plaintiff was given two "closing shifts," on Wednesday and Thursday nights. Plaintiff depo. at 180-181. In the spring of 2002, she received the Monday and Tuesday night closing shifts. *Id.* at 183. Plaintiff thus worked four of the six available closing shifts in 2002 until her suspension in May, 2002. *Id.* at 253-

---

[1] This is the longest the plaintiff has ever worked anywhere. She held at least 27 jobs in the last ten years. Plaintiff depo. at 117.

[2] Frank Stitt is the president and executive chef at defendant restaurant. Pardis Sooudi is his wife, and is also employed by defendant restaurant. Stitt depo. at 8-9.

256, 258-259. Plaintiff initially testified that two of the closing shifts were taken away from her when she filed her first EEOC charge. *Id.* at 256. However, she then stated that two of the closing shifts were taken away from her when she returned from her suspension on May 31, 2002, which was prior to filing her EEOC charge. *Id.* at 257-258, 260-262, 272-273.

Plaintiff asserts her suspension in May, 2002, was the result of a misunderstanding with a customer. She filed her June 6, 2002 EEOC charge to find out why she was suspended because no one would tell her. Plaintiff depo. at 294. She heard from a co-worker that a customer was "chewing out" an assistant manager due to something plaintiff had done while waiting on the table. *Id.* at 295. Plaintiff admits the assistant manager told her the customer alleged plaintiff had made a comment about a tip at the table. *Id.* at 298. The plaintiff had waited on a table of seven women and was clearing the table while the women paid their tabs. *Id.* at 298. She stated:

> ... I remember hearing somebody saying something about, "Did you leave her the tip in with your check?" So she was, I guess, trying to find out – she goes, "Ooh, I didn't," because she asked me about how much the glass of wine would be. I was telling her it was like $8.60, $8.70, somewhere along in there, so she would know what to write it out with....
>
> They were just kind of asking her, "Did you put a tip in with that check when you wrote it?" You know, something like that to that effect, and they were laughing. So she was looking up at me like she was just looking around ....

3

>And I could overhear that. It was like, "Did you include the tip in there?" She was like, "What was the tip?" And I don't know. I guess maybe her friend didn't say anything, wouldn't say anything. It was like, "Na, don't worry about it," blah, blah, blah. She was like, "What was the tip?" She looked at her friend. So then she looks at me. She is looking at me as I'm clearing; and she goes, "What was the tip?" So I didn't say anything because I'm just thinking at the time that she's still talking to them. But she pointed and looked at me; and she goes, "What was the tip?" I go, "Oh, she left me" – and I told her what the young lady left for the tip .... And I said, "It was two or three bucks and some change," or something like that. She was like, "Oh, I didn't think" – I didn't pay attention. I didn't think there was anything, because like I said, I took it as this young lady, she – like I said, yes, they were having a conversation; but when somebody looks at you, they don't necessarily call your name .... I didn't realize that anybody had taken offense to that because I didn't mean it in an offensive way ....

*Id.* at 299-303. Nicholson states the service they received from plaintiff the night in question was "painfully slow" and that plaintiff was rude. Declaration of Nicholson, ¶ 4, defendant Exhibit 7. At the end of their meal, plaintiff "made a snide remark about the tip one of the women in my party had left her and how we should be able to do better than that ...." Declaration of Nicholson, ¶ 5; Robb declaration, defendant exhibit 5, ¶ 4. Nicholson complained to the supervisor that night and left a number for Robb to call her the next day. *Id.*, ¶ 6. Nicholson told Robb the plaintiff should be terminated for her conduct. *Id.*

Plaintiff asserts none of this was true and she had no idea why Nicholson was upset. Plaintiff depo. at 306-307. Plaintiff stated it was a misunderstanding on

Nicholson's part.³ *Id.* at 311, 315. Robb told the plaintiff that she was going to receive a one week suspension. *Id.* at 307-308, 310, 331; exhibit 7 to plaintiff depo.

Plaintiff admits at least one employee was terminated by defendant for making a rude remark to a customer. Plaintiff depo. at 359-360. However, she asserts she was suspended because Robb"was being racist at the time" for taking the word of a white person over her own. *Id.* at 360-361.

In her June 6, 2001 EEOC charge, plaintiff complains that her two closing shifts were taken away from her without notice. Plaintiff depo. at 260-261, 269; exhibit 5 to plaintiff depo. Plaintiff alleged that the reduction in shifts was further punishment for the incident with Nicholson.⁴ Plaintiff depo. at 262-264, 420. However, plaintiff also asserts she filed her first EEOC charge because white employees were notified of shift changes in advance and she was not.⁵ *Id.* at 271. The only employee plaintiff

---

³In fact, plaintiff claims each write-up she received during her employment at defendant restaurant was due to a misunderstanding or someone else simply being wrong. Plaintiff depo. at 333-344. *See also* exhibits 8 and 33 to plaintiff depo.; Stitt depo. at 18-19. This includes a one week suspension plaintiff received the preceding year. Plaintiff depo. at 339-341; exhibit 10 to plaintiff depo. She also received write-ups at other places of employment due to her attitude. Plaintiff depo. at 342-343; exhibit 11 to plaintiff depo.

⁴An employee with the closing shift would earn more money than someone who left earlier. Plaintiff depo. at 421; Stitt depo. at 20.

⁵Plaintiff states "it would have been nice" for the defendant to notify her of the schedule change during her suspension. Plaintiff depo. at 278.

5

could identify who fit in this category was Jim Baker. *Id.* at 269-270, 276. However, Baker asked to be removed from the closing shifts. *Id.* at 189-190.

Plaintiff retained her other two closing shifts until her employment was terminated, which was still more closing shifts than most of the white employees had.[6] Plaintiff depo. at 273, 281-282. During this time period, she also gave away one or two shifts a week. *Id.* at 282-283. She began to give away her Wednesday shifts because that was the day Frank and Pardis Stitt, were most likely to be in. *Id.* at 86-88, 172-173, 195, 492-495. Neither of them ever mentioned the EEOC charge to her, but she felt uncomfortable around them because the staff and management were "walking around on eggshells." *Id.* at 87, 172-173.

Plaintiff was ultimately terminated for allegedly altering a credit card receipt to include a tip where the customer did not leave one. *See* exhibits 13-15, 19 to plaintiff depo.; Robb declaration, ¶ 11; Wunderlich declaration, defendant exhibit 6, ¶ 2. She was in sole possession of the receipt until she turned it in to the manager on duty and agrees that no one other than herself or the customer could have had the opportunity to change the receipt. Plaintiff depo. at 380-381; Robb declaration, ¶ 12.

---

[6]She also picked up a day shift. Plaintiff depo. at 422. Plaintiff's paycheck was actually more money after her suspension because of the added day shift. Plaintiff depo. at 422.

However, she adamantly denies having changed the receipt.[7] Plaintiff depo. at 381, 401-402. She further agrees that the total on the receipt appears to have been changed, but does not know who may have changed it. Plaintiff depo. at 385-386, 392-393; Robb declaration, ¶ 13. The plaintiff admits she input the six dollar tip into the computer and therefore, at the time she turned in the receipt at the end of the evening, the alteration had already occurred. Stitt depo. at 67. She states theoretically that the customer could have been in a party of six or more so that she would have possibly added an 18% tip to the total. Plaintiff depo. at 386-390, 400-401, 516-517. However, work procedure required that she inform the customer if she had done so and cannot say this actually happened in this case. *Id.* at 391-392, 394-395. Just changing the receipt would not be an appropriate way to do this. *Id.* at 395-397. When first confronted, the plaintiff said that "she didn't recall. She seemed like she had just been caught." Stitt depo. at 68.

The plaintiff was terminated by Stitt. Plaintiff depo. at 399. Prior to her termination, the plaintiff did not suggest it may have been a party of six or more. Stitt depo. at 73. When asked whether anyone other than herself could benefit from the tip

---

[7]When confronted by Stitt, plaintiff told him she could not recall this, but would not steal just $6.00. He added "when she did not have an explanation that would prove to me other than what seems to me to be 100 percent clear, that she had fraudulently done this, then I said that due to this theft we were going to have to let her go." Stitt depo. at 32-33, 37-39.

7

being changed, the plaintiff replied, "Bottega .... because they got a reason to fire me." Plaintiff depo. at 402.

The customer in question, Payton Prentiss, first called defendant on July 27, 2002 about his credit card charges. Wunderlich declaration, ¶ 2. Laura Wunderlich, a dining room manager for defendant, asked him if possibly he forgot to record the tip on his copy of the receipt. *Id.*, ¶ 3. On August 7, 2002, after retrieving the merchant copy of the receipt from storage, Wunderlich again called Pretiss to make sure he did not recall changing the charge total. *Id.*, ¶ 5. The plaintiff was terminated on August 16, 2002. Plaintiff depo. at 156; Robb declaration, ¶ 14.

Due to her already pending EEOC charge, Stitt "wanted to be damn sure that there was no mistake; that we were not going to pursue this if we were not 100 percent sure that she had been caught stealing." Stitt depo. at 42-43. Since her termination, defendant has found other instances where the plaintiff appeared to have altered credit card receipts. *Id.* at 70-71, Heuer depo. at 29-31.

Upon her termination, the plaintiff filed a second EEOC charge claiming discrimination and retaliation. Exhibit 34 to plaintiff depo. The plaintiff is sure her termination is racially motivated and related to the prior EEOC charge because she does not know of anyone else who was terminated when a customer called to complain a credit card slip had been altered. Plaintiff depo. at 406-407, 409-410.

8

However, she knows of no one else who was accused of intentionally altering a credit card slip.[8] *Id.* at 409, 429, 433. *See also* Stitt depo. at 24-25; Booth depo. at 33-34, 38, 75-76; Heuer depo. at 16, 24.[9] She does list Steve Kimble,[10] Glendon Williams[11] and James Claiborn[12] as each having a customer dispute a tip and being made to repay the amount defendant credited to the customer. Plaintiff depo. at 508. None of these disputes involved theft. Heuer depo. at 21-22; Robb declaration, ¶ 15. The plaintiff

---

[8]The plaintiff asserts that if she had changed the charge total to give herself a tip when the customer did not intend to leave one, this would be stealing. She agrees that if she had done this very thing, she should have been fired. Plaintiff depo. at 412-413, 470. A white male server who had devised a way to steal cash from the restaurant was terminated. Stitt depo. at 24-25.

Dena Booth testified that if a server steals from a guest, he or she must be terminated because the restaurant's reputation is at stake. She explained "in this business it's a very strict word of mouth, and it wouldn't take a New York minute for people not to come if they think that a thief is around." Booth depo. at 78-79.

[9]Kara Hollis Heuer was an office assistant at defendant restaurant from March 2001 to September 2002. Heuer depo. at 7-8.

[10]Kimble was left a $347.00 tip on a $385.00 tab. Realizing an error, he went to the manager who authorized him to show the receipt to the customer, who was in the valet line. Heuer depo. at 18. The customer thanked him and changed the tip to $72.00. *Id.* The following Monday, a representative of the customer called an instructed the tip be further changed to $48.00. *Id.* at 19. Kimble repaid the defendant the difference in the authorized tip amount. *Id.* at 20. No suggestion that Kimble had tried to steal money from the customer was ever made. *Id. See also* declaration of Charlie Hayes, a dining room manager for defendant.

[11]Williams states he has never been accused of stealing from a customer. Williams declaration, defendant exhibit 10, ¶ 5.

[12]Claiborn denies ever being accused of intentionally altering a tip left by a customer on a charge receipt, without the express authority of that customer. Claiborn declaration, defendant exhibit 11, ¶ 5.

9

asserts the only difference between the facts alleged against her and each of these is that all three of the gentlemen named are white.[13]  Plaintiff depo. at 510-515.

The plaintiff has no evidence her termination was related to her race or to her EEOC charge. Plaintiff depo. at 427. The only evidence she has that Frank Stitt is prejudiced or racist is the fact she was fired. *Id.* at 485-486. She was replaced by Carlos Bryant, a black male.[14]  Stitt depo. at 58-59; Robb declaration, ¶ 14.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

---

[13]On October 1, 2002, the plaintiff filed a third EEOC charge, asserting males were paid more than she was. Plaintiff depo. at 441-443; exhibit 24 to plaintiff depo. The plaintiff earned $5.00 per hour as a server from April, 2001 until she was terminated. *Id.* at 443-444. She was given that raise by Dean Robb. *Id.* at 449-450. She asserts James Claiborn, another server, earned $6.00 per hour. *Id.* at 444-445. By declaration, Claiborn denies ever telling the plaintiff he earned more than $5.00 per hour. Claiborn declaration, ¶ 4.

[14]Dena Booth testified that some of the longest term employees with defendant are African-American. Booth depo. at 58.

> party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

11

## LEGAL ANALYSIS

Plaintiff asserts that her termination constitutes race discrimination and/or retaliation. The plaintiff does not specify whether her evidence is meant to constitute direct or circumstantial evidence of discrimination, but as the court can find no direct evidence of discrimination, the court applies the analysis required for circumstantial evidence. This court must apply a three prong test fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973). *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981); *Busby v. City of Orlando,* 931 F.2d 764, 777 (11th Cir.1991). First, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-1528 (11th Cir. 1997).

Assuming the employee meets this burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th Cir.1996). The defendant can feasibly present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted.

*Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 950 (11th Cir.1991), *cert. denied,* 502 U.S. 1058 (1992)(quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590. 596 (11th Cir.1987).

Once a defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination drops from the case. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094 and n. 10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. The focus of the case after the defendant meets its burden of production is on the defendant's subjective intent and the motivation behind the defendant's adverse employment action directed at plaintiff. *Harris*, 99 F.3d at 1083.

*Race Discrimination*

The plaintiff meets her prima facie burden of proof by establishing that (1) she belongs to a racial minority; (2) she was subjected to an adverse job action; (3) her employer treated similarly situated employees outside the protected classification more favorably; and (4) she was qualified for her job. *Holifield v. Reno,* 115 F.3d 1555, 1562-63 (11th Cir.1997); *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000). The court has carefully read the plaintiff and the defendant's

evidentiary submissions. The parties do not dispute that the plaintiff meets prongs one, two and four of her prima facie case. However, the court can find no evidence (as opposed to argument) that any employee outside the protected class was treated more favorably than the plaintiff.

The defendant asserts that the plaintiff was terminated for stealing from a customer. The plaintiff agrees that altering a credit card tip is a terminable offense. Plaintiff depo. at 412-413, 470. Although the plaintiff argues white employees were not terminated for theft by intentional alteration of a credit card receipt, no other employee has ever been accused of intentionally altering a receipt to obtain a tip where the customer did not leave one. *See* plaintiff depo. at 409, 429, 433; Stitt depo. at 24-25; Booth depo. at 33-34, 38, 75-76; Heuer depo. at 16, 24. The plaintiff cannot show that she has been treated differently than non-minority employees. Additionally, the defendant provided evidence that the one other employee accused of theft, a white male, was terminated. Stitt depo. at 24-25.

The court finds that the plaintiff was treated similarly to the only other employee accused of stealing. None of the other white employees plaintiff named as treated more favorably engaged in comparable conduct. The court finds that the plaintiff has failed to make out a prima facie case of race discrimination as she cannot show any employee outside her protected class who was treated more favorably than

she was. This court need go no further in its analysis of the plaintiff's claim of race discrimination.

*Retaliation*

To establish a prima facie case of retaliation, the plaintiff must show that she (1) engaged in Title VII protected activity; (2) an adverse employment action occurred; and (3) there is a causal connection between the protected activity and the adverse employment action exists. *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999). *See also Gupta v. Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

The plaintiff here offers the protected activity of filing a prior EEOC charge. The parties dispute whether a causal connection exists between the filing of that charge and the plaintiff's termination.

Assuming, without deciding, that the plaintiff could establish a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th Cir. 1996). The defendant can feasiblely present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted. *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 950 (11th Cir.1991), *cert. denied*, 502 U.S. 1058 (1992)(quoting *Grigsby v.*

*Reynolds Metals Co.,* 821 F.2d 590. 596 (11th Cir.1987). The defendant argues that the plaintiff was not terminated for her EEOC charge. Rather, she was accused of stealing from a customer.

Although the plaintiff argues she did not alter the credit card slip, the truth of the allegations against the plaintiff is not a relevant inquiry for this court to undertake. The Eleventh Circuit has "repeatedly and emphatically held a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) (internal citations omitted).

In the facts before this court, the defendant was faced with a customer's allegation that his credit card slip was altered. The defendant investigated his claim, asked the customer twice if he might be mistaken, obtained the merchant copy of the receipt from storage, and asked the plaintiff for an explanation. The plaintiff agrees she was in sole possession of the receipt until it was turned in at the end of her shift, and that prior to turning it in, she input the six dollar tip in question into the computer to "close out" the check and received the six dollar tip at the end of her shift. Plaintiff depo. at 380-381; Stitt depo. at 67. She agrees the receipt appears to have been

changed. Plaintiff depo. at 385-386, 392-393. Although she denies altering the receipt, she states she may have altered it to include a tip for a party of six or more. Plaintiff depo. at 386-390, 400-401, 516-517. Such is the undisputed evidence the defendant had before it at the time of the plaintiff's termination. Whether the plaintiff actually engaged in the conduct at issue in not the relevant inquiry.

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)) .... We "do not ... second-guess the business judgment of employers." *Combs,* 106 F.3d at 1543; *accord Alexander,* 207 F.3d at 1339, 1341 .... (internal citation omitted)).

*Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir.2000). *See also Sweeney v. Alabama Alcoholic Beverage Control Bd.,* 117 F.Supp.2d 1266, 1272-1273 (M.D.Ala.2000) ("in cases where the decisionmaker does not witness the alleged infraction, '[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.' In other words, whether or not a plaintiff actually committed the work rule violations is immaterial on the issue of pretext. Rather, what is material is whether or

not the employer believed the allegations to be true, not whether they were in fact true") (internal citations omitted).

Given the facts of this case, the court finds that the defendant's belief that the plaintiff intentionally altered a credit card receipt to steal from a customer was a legitimate, non-discriminatory reason to terminate her. Because the defendant held this belief in good faith, the court cannot find the accusations were a pretext for discrimination or retaliation. The defendant is therefore entitled to judgment in its favor on all counts of the plaintiff's complaint.

## CONCLUSION

The court finding that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial, the court **ORDERS** that the defendant's motion for summary judgment is hereby **GRANTED**. The plaintiff's claims are **DISMISSED WITH PREJUDICE**. Each party is to bear its own costs.

**DONE** and **ORDERED** this the 9 day of October, 2003.

INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE